## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **CAROL RODGERS,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 07-C-6262 |
| -against- | ) | |
| | ) | Judge Milton I. Shadur |
| **McDONALD'S CORPORATION,** | ) | |
| | ) | Magistrate Judge Mason |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF'S RESPONSE TO
## DEFENDANT'S FIRST SET OF INTERROGATORIES

Plaintiff, by her attorney, David Porter, Esq., responds to Defendant's First Set of Interrogatories as follows:

### General Objections

1.      Plaintiff objects to the Defendant's Interrogatories to the extent that they are vague, overbroad, or otherwise unduly burdensome.

2.      Plaintiff objects to the Defendant's Interrogatories to the extent that they seek information not precisely answerable in this format, or as phrased, and are therefore unreasonable and burdensome to request through the use of such Interrogatories.  In this regards, Defendant could have obtained much of such information more accurately, and avoided much of the unnecessary burden on Plaintiff, through deposition testimony or phrasing the Interrogatories in a different manner.

3.      Plaintiff objects to the Defendant's Interrogatories to the extent that they call for production of information that is in the possession, custody, or control of the Defendant  -  with

Defendant not yet having provided full Interrogatory and Document Responses, and with

depositions of the Defendant and its employees still to be taken.

4.    Plaintiff objects to Defendant's Interrogatories to the extent that they seek

documents or information protected from disclosure by either the attorney-client privilege or by

the attorney work-product doctrine.

Plaintiff has, and will, conduct a reasonable and diligent search for responsive

information.  Plaintiff reserves the right to produce additional information that may come to her

attention or will become available in the future, and to use such information at any hearing or

proceeding, including at the trial of this lawsuit.


Without waiving these objections, Plaintiff has attempted to interpret these

Interrogatories reasonably and to provide answers accordingly.


**INTERROGATORY NO. 1:**    Identify each and every person (excluding your attorneys) with
whom you communicated or discussed (in any fashion and at any time) any of the facts or
allegations contained in the Complaint.  With respect to each person identified, state or otherwise
describe the content of each such communication, including but not limited to what you told the
person and what the person said in response.

**RESPONSE:**    See General Objections, including Nos. 1, 2 and 3.  In particular, this

interrogatory contains multiple conversations over potentially 6+ years with multiple people, and

multiple potential questions regarding multiple paragraphs of Plaintiff's Federal Complaint, and

it is particularly unclear how much specificity is requested or called for (for example, is

Defendant looking for Plaintiff to describe all work conversations with co-workers, supervisors,

management, HR, etc., and if so in how much detail).  In this regards, Defendant could have

obtained much of this information more accurately, and avoided much of the unnecessary burden

on Plaintiff, either through deposition testimony or phrasing this Interrogatory in a different

manner (for example, by pointing to certain specific factual incidents/ events).

Subject to and without waiving these objections, Plaintiff provides that with regards to

Plaintiff's complaints she complained to the following McDonald's Corp. employees (please

note that what is listed as being discussed is not a word for word, or complete, recitation of what

was discussed, which would be extremely burdensome and unreasonable for the reasons that are

provided and referenced in the objections listed above):

**Greg Sottolano (HR)**    -    By e-mail dated October 7, 2004 (Bates 6-7) Plaintiff complained
to him about being subjected to a "hostile environment", as well as her being "treated with
hostility and harassed" in the RMHC. The factual substance of these complaints are provided in
detail within said e-mail.

**Dave Dresden (HR)**    -    Plaintiff's aforesaid October 7, 2004 e-mail was forwarded by Mr.
Sottolano to Mr. Dresden. Plaintiff met with Mr. Dresden on October 11, 2004 and discussed
her complaint issues contained in the e-mail. See also Plaintiff's October 27, 2004 e-mail to Mr.
Dresden (Bates 8). Mr. Dresden advised Plaintiff to try to stay in the department until at least a
year because, he said, it would be easier for Plaintiff to transfer out of the department then.
It should be noted that shortly after Plaintiff's October, 2004 complaints to HR that
Plaintiff was being subjected to a hostile work environment, Janet Burton retaliated against
Plaintiff by placing Plaintiff on the first PIP in January, 2005.

**Janet Burton**    -    Plaintiff had a number of discussions with Janet Burton in the period 2004 –
August 8, 2006 regarding her hostile, abusive, and unreasonable treatment of Plaintiff during
Plaintiff's employment. This is discussed in greater detail at Exhibit "A", which is made a part
hereof.
See also Exhibit "D", which discusses the August 8, 2006 termination meeting in greater
detail.

**Peggy Caputo**    -    See Plaintiff's October 27, 2004 e-mail to David Dresden (Bates 8)
regarding Plaintiff bringing to Ms. Caputo's attention a situation with regard to the phone line
that was used for general inquiries, and the unwarranted and abusive treatment that Plaintiff was
then subjected to.
Additionally, in December, 2005 there was a "Friends" luncheon that the Friends of
RMHC (RMHC stands for Ronald McDonald House Charities) put on every year. Plaintiff's
predecessor (Ann DeCloux, who is white) had been invited and attended in past years - but

Plaintiff and another black admin (Sheila Young) were not invited this year. It is Plaintiff's belief that Peggy Caputo and perhaps others actively attempted to quietly leave Plaintiff behind to answer the phones without telling Plaintiff of the luncheon, in that flyers about the luncheon went around the office, but Plaintiff did not receive one, and typically when events such as this occur in which several individuals in the field relations group are to be out of the office, then people make announcements, but Plaintiff was not so informed. Plaintiff became aware of the luncheon shortly before the employees from the field relations group were going to leave (with Plaintiff to be left behind to answer all the phones). Plaintiff inquired of Ms. Caputo shortly before Ms. Caputo and the others were supposed to leave for the Friends luncheon, and Plaintiff inquired about the luncheon and why Plaintiff and Ms. Young were not invited and going. Ms. Caputo then decided to stay behind at that point, with her stating that she (Ms. Caputo) thought it would be seen as discriminatory. Ms. Caputo had stated she felt it would be seen as discriminatory even though Plaintiff did not specifically use the word "discrimination" (although Plaintiff believed it was racially discriminatory and Plaintiff had implied such). Ms. Caputo then contacted Ken Barun, who was out of the office, to inform him that Plaintiff and Ms. Young might think they were discriminated against. Both Plaintiff and Ms. Young were called into separate meetings with Angelique Kelly-Lara and questioned about this. It is Plaintiff's understanding that Ms. Caputo was reprimanded/ chastised (at least verbally) by Defendant for specifically elaborating that Plaintiff and Ms. Young were making a claim of discrimination.


**Angelique Kelly-Lara**   -  Plaintiff complained to her on several occasions in the period February, 2006 to August 8, 2006 about the abusive treatment that Plaintiff was being subjected to, the uneven workload, and that Plaintiff's evaluation was withheld, and changed and by Janet Burton, and not accurate or representative of Plaintiff's good to excellent work performance. Plaintiff also told her that Janet Burton would not meet with Plaintiff. In this regards also see Plaintiff's detailed e-mail dated February 14, 2006 to her (Bates 14-16) and other e-mails between Plaintiff and Angelique Kelly-Lara (including but not limited to Plaintiff's April 19, 2006 e-mail to her (Bates 17).

Plaintiff communicated with Angelique Kelly-Lara by e-mail as well as in person, with Plaintiff having approximately two meeting with her alone and approximately three meetings also with Janet Burton (including also the August 8, 2006 meeting in which Plaintiff's employment was terminated.

The last time Plaintiff spoke with Ms. Kelly-Lara was on or about August 15, 2006, which was after Plaintiff had been fired. Plaintiff had learned, the day after Plaintiff was fired, that McDonald's Corp. was telling people in the Charity that Plaintiff had quit Plaintiff's job. Plaintiff called HR to find out what was on Plaintiff's record, and was told that it listed that Plaintiff had quit. Plaintiff was in a near panic when Plaintiff called Ms. Kelly-Lara, asking her why they were telling people Plaintiff had quit Plaintiff's job, when Plaintiff knew Plaintiff had not quit. Plaintiff also asked how would Plaintiff get unemployment if, as Defendant was claiming (falsely) Plaintiff had quit Plaintiff's job? In Plaintiff's mind homelessness loomed in front of Plaintiff. Plaintiff felt helpless and desperate, and she something close to terror. It's hard enough to survive on unemployment, let alone survive without a penny coming in. Ms. Kelly-Lara barely said anything, but that she didn't have anything to do with what the unemployment office would do, and that it would be their decision. Plaintiff couldn't believe what she was hearing. Plaintiff said to Ms. Kelly-Lara, "Angelique, you know you fired me."

Ms. Kelly-Lara did not deny that she fired Plaintiff, nor did she say anything in response - just silence. Plaintiff then said good-bye and got off of the phone. All Plaintiff could do was pray that somehow the unemployment office would rule favorably for Plaintiff.

**Brenda Elliott**   -    Plaintiff would have lunch with Brenda Elliott (a fellow admin.) on occasion and discuss general work issues.

In or about March, 2006 Plaintiff told Ms. Elliott about the abusive treatment that she was being subjected to, and that Plaintiff was being held back from advancement. Ms. Elliott encouraged Plaintiff to speak with Kim Smith in HR (marketing was one of Ms. Smith's departments).

In or about November, 2007 Plaintiff had lunch with Ms. Elliott. Plaintiff and Ms. Elliott did not discuss what happened during Plaintiff's employment or in the termination of Plaintiff's employment. This was the last time that Plaintiff spoke with Ms. Elliott.

**Kim Smith**   -    In or about March-June, 2006 Plaintiff spoke with Ms. Smith (once being in person and twice by telephone thereafter).

Plaintiff spoke with Kim Smith the first time to get her assistance in seeking out another position. Plaintiff told her what Plaintiff had received for a bonus and tip and she tried to assist Plaintiff by telling Plaintiff about open positions within Plaintiff's area of responsibility. Plaintiff spoke to Ms. Smith again on the phone when Plaintiff realized through the grapevine that a position she had told Plaintiff about was already taken. Plaintiff last spoke to her when Plaintiff's situation was heating up within the department. Plaintiff told her about the hostility and about being blocked from advancing at that time. Plaintiff also told her that Plaintiff believed that Janet Burton had changed Plaintiff's evaluation. To Plaintiff's knowledge Ms. Smith did not intervene to attempt to stop Ms. Burton's abuses, but instead she suggested that Plaintiff attempt to get back into Ms. Burton's good graces.

**Debra Curry**   -    Ms. Curry worked down the hall from Plaintiff and would discuss general work issues with her. Plaintiff spoke with Ms. Curry in or about June-July, 2006 about Plaintiff wanting to transfer out of the department, and that Janet Burton was holding Plaintiff back. Plaintiff saw Ms. Curry in the hall one day in or about July, 2006, just after Plaintiff had been refused an interview for the Karen Wells position. Plaintiff was very upset, and she asked Plaintiff how things were going. Plaintiff told her that Plaintiff was being held back from advancing out of RMHC. Ms. Curry suggested that Plaintiff speak with Pat Harris

**Plaintiff's August 2, 2006 e-mail**   -    Plaintiff sent this 1-paragraph e-mail to Janet Burton, Angelique Kelly-Lara and Marty Coyne, with the e-mail (Bates 25) providing as follows:

> "Now that Janet is back in town, I would like to meet with you all if you
> don't mind. Please let me know when you are available and I'll find a room.
> I would like to talk to you all about why my advancement opportunities are
> disappearing, for I believe that there is some negative feedback coming from
> this team regarding my performance. Evidently, there is something I don't
> know about my status. Thanks."

After Plaintiff sent this August 2, 2006 e-mail, Plaintiff's requested meeting was set up for August 4, 2006, with this later being changed to August 8, 2006 at 4:00 pm. (but such requested meeting never took place). It is Plaintiff's belief that at the time Defendant issued Plaintiff the PIP and terminated Plaintiff's employment on August 8th that Defendant realized that Plaintiff's e-mail and what Plaintiff intended to address and complain about in connection with same, was a protected complaint of race discrimination.

**Pat Harris**   -   Plaintiff's August 3, 2008 meeting with Pat Harris (that lasted approximately 45-50 minutes), and her complaints to Ms. Harris in that meeting, are provided in greater detail at Exhibit "B" annexed hereto, which is made a part hereof.

**The August 8, 2006 meeting**   -   This meeting, in which Plaintiff was present with Janet Burton and Angelique Kelly-Lara, occurred at 2:00 pm and lasted for approximately 35 minutes, with their presenting to Plaintiff the PIP, Plaintiff complaining about the lies contained in the PIP, and Defendant terminating Plaintiff's employment. This is discussed in greater detail at Exhibit "D" annexed hereto, which is made a part hereof.

**Sheila Young**   -   Plaintiff would work with Ms. Young (admin.) on occasion, with Ms. Young also periodically helping Plaintiff with Plaintiff's unduly heavy workload. Ms. Young personally observed Plaintiff's heavy workload and at least some of the abuses that were committed against Plaintiff by Peggy Caputo and Janet Burton.
Plaintiff communicated with Ms. Young (either in-person, by telephone, or by e-mail) on various occasions in the period May, 2004 to December, 2007 that Plaintiff was attacked/ harassed by Peggy Caputo and Janet Burton. Plaintiff also told Ms. Young that Plaintiff did not quit her McDonald's Corp. employment (which is what Defendant was claiming), but that Plaintiff was fired from Plaintiff's employment.

**Alvin Collins**   -   See Exhibit "D" annexed hereto regarding Plaintiff's August 8, 2006 conversation with Mr. Collins.

**Carol Simmons**   -   Plaintiff spoke with her on August 9, 2006, the day after Plaintiff was terminated from her employment. In that conversation Ms. Simmons advised that "they are saying that you quit." Plaintiff told Ms. Simmons in that conversation that Plaintiff did not quit, but that Plaintiff was fired.
In or about August, 2007 Plaintiff had lunch with Brenda Elliott and Carol Simmons. Plaintiff and Brenda and Carol Simmons did not discuss what happened during Plaintiff's employment or in the termination of Plaintiff's employment. This was the last time that Plaintiff spoke with Ms. Simmons.

Answering further, see Plaintiff's Rule 26 initial disclosures, Plaintiff's Federal

Complaint, and the documents submitted by Plaintiff and Defendant in discovery.

**INTERROGATORY NO. 2:**    Identify every medical care provider, physician, clinic, hospital, treatment center, counseling facility, and/or holistic medicine facility with whom or with which you have ever consulted, sought and/or obtained mental or emotional examination, care or treatment of any kind at any time in your life.  If medical records are not available, for each such medical care provider, physician, clinic, hospital, treatment center, counseling facility, and/or holistic medicine facility for which no record is available, provide detail regarding each visit or session, including information such as: the name, address, and telephone number of the provider, facility and/or professional;  the condition for which you sought consultation, examination, care, or treatment;  the date(s) of each such consultation, examination, care, or treatment;  the diagnosis and prognosis given at each such visit or session;  and the treatment received, including medication and/or hospitalization.

**RESPONSE:**    Plaintiff did not have any consultations for mental or emotional examinations, care or treatment.

In 2004, due to the heavy one-sided workload, disparate restrictions on overtime (see tip sheets for Plaintiff as compared to the other admin.'s for 2004 - 2006) and extreme pressure placed on Plaintiff during Plaintiff's first few months in the department, Plaintiff developed a hyperactive thyroid in or about May, 2004, and Plaintiff had to have her thyroid destroyed in June, 2004.  Plaintiff's doctor for this was Dr. Wahid Kassar, located at 7 Blanchard Circle, Suite 202, Wheaton, Illinois 60187.  (630) 653-4526.

It is Plaintiff's understanding that one of the main causes of hyperthyroidism is stress. While the other admins in the department worked for not over 3 people, Plaintiff worked for 6 people and then later 7 people.  The other admins had managers who were self-sufficient and pretty much did their own copying, faxing, etc., whereas Janet Burton was encouraging and pushing her managers to use me to do their own copying, faxing, etc., as well as her offering me to other staff outside of RMHC.

**INTERROGATORY NO. 3:**    For each and every cause of action alleged in the Complaint separately list and describe in detail each and every one of your damages, including, but not limited to, wage loss, loss of benefits, pain and suffering, emotional distress, or other alleged damage, and for each element or item of damage alleged state: the calculation;  the method of calculation;  and the identity of the person who made such calculation.

**RESPONSE:**    See Exhibit "E" annexed hereto.

**INTERROGATORY NO. 4:**    Identify each and every admission relating to this lawsuit that you claim was made by McDonald's or its agent, employees, or anyone acting or purporting to act on behalf of McDonald's, stating but not limited to the following:  what the exact admission was;  to whom it was made;  when it was made;  and whether it was oral or written.  If written, please provide the location of all such documents as well as a copy of all such documents.

**RESPONSE:**    See General Objections, including Nos. 1 - 4.  In particular, this interrogatory potentially contains multiple possible "admissions" over potentially 6+ years (including but not limited to most every verbal and written statements by any management employee of Defendant, as well as the IDHR Position statement and pleadings in this matter), and it is particularly unclear how much specificity is requested or called for in interpreting what Defendant is seeking in terms of "admissions".  In this regards, Defendant could have obtained much of this information more accurately, and avoided much of the unnecessary burden on Plaintiff, either through deposition testimony or phrasing this Interrogatory in a different manner (for example, by pointing to certain specific factual incidents/ events and asking what occurred).

Moreover, this Interrogatory improperly calls upon Plaintiff to make legal conclusions of whether something is, or is not, an "admission", which is an improper subject for an interrogatory.

Moreover, Defendant's request herein for "admissions" is not in compliance with FRCP Rule 36 in that it doesn't  list each matter separately stated and is extremely vague as to what specific admissions it is looking for.  If Defendant wanted Plaintiff to "admit" or "deny" specific facts then Defendant should have made a request for those admissions in the format provided under FRCP Rule 36 and so listed those facts.

**INTERROGATORY NO. 5:**    Identify each and every civil or criminal lawsuit, arbitration, workers compensation proceeding, labor grievance, or formal or informal administrative claim to which you have been a party, stating the nature of each suit, claim, or proceeding, including but not limited to the following:  where it was pending;  the names and addresses of the parties;  the time period of the lawsuit or claim;  and the details of the ultimate disposition or resolution of the matter.

**RESPONSE:**    In January, 2001 Plaintiff filed a Charge of Discrimination (race) with the EEOC against her then employer, Servicemaster, EEOC Charge No. 21BA10516. Servicemaster, located at 2300 Warrenville Road, Downers Grove, Illinois, was subsequently bought out by Aramark.   That matter was ultimately "resolved".

**INTERROGATORY NO. 6:**    Identify each person who you intend to call as an expert witness at trial in this case, stating:  the expert's full name and address;  the details regarding his/her qualifications;  the subject matter on which he/she is expected to testify;  the substance of the facts and opinions to which he/she is expected to testify;  and a summary of the grounds for each opinion.

**RESPONSE:**    Plaintiff objects to this Interrogatory to the extent that it is unduly burdensome at this time, as well as incapable of reasonable ascertainment at this time, prior to Defendant having provided full Interrogatory and Document Responses, and prior to depositions of Defendant and its present and former employees having been held, with a response to such inquiry being premature and not yet required by the Court.

Subject to and without waiving these objections, Plaintiff provides as follows:  Plaintiff states that she has not yet determined which expert witness(es) she will call at the trial of this matter.

**INTERROGATORY NO. 7:**    State the name, complete address, telephone number, and job title of any person you intend to call as a witness at trial, and for each such person, provide a summary of the topics on which each such person is expected to testify.

**RESPONSE:**    Plaintiff objects to this Interrogatory to the extent that it is unduly burdensome at this time, as well as incapable of reasonable ascertainment at this time, prior to Defendant

having provided full Interrogatory and Document Responses, and prior to depositions of

Defendant and its present and former employees having been held, with a response to such

inquiry being premature and not required by the Court prior to the time of the preparation and

serving of the Final PreTrial Order.

Subject to and without waiving these objections, Plaintiff provides as follows:  Plaintiff

states that she has not yet determined who she will call as a witness at the trial of this matter.


**INTERROGATORY NO. 8:**    Identify each and every instance in which you have been
reprimanded, informally corrected, or otherwise informed you were not properly, satisfactorily,
and/or adequately performing your duties at any employer (including McDonald's), stating for
each such reprimand or incident the following:  the name and address of the employer;  the full
name and title of the individual(s) who reprimanded you, corrected you, or otherwise informed
you that you were not performing satisfactorily;  the date and time of those incidents:  the
substance of those reprimands or corrections;  what was communicated to you;  and what, if any,
response you made.

**RESPONSE:**    See General Objections, including Nos. 1 - 3.  In particular, Defendant's request

that Plaintiff advise of every time in Plaintiff's 40+ employment history that Plaintiff has been

"informally corrected, or otherwise informed you were not properly, satisfactorily, and/or

adequately performing your duties" is extremely difficult to interpret, potentially could include

each time Plaintiff was shown how to do any function of her job, and is unreasonably vague,

overbroad, and otherwise unduly burdensome.

Plaintiff also objects to this Interrogatory to the extent that it seeks information not

precisely answerable in this format, or as phrased, and is therefore unreasonable and burdensome

to request through the use of such Interrogatory.  In this regards, Defendant could have obtained

much of such information more accurately, and avoided much of the unnecessary burden on

Plaintiff, through deposition testimony or phrasing this Interrogatory in a different manner.

Plaintiff also objects to this Interrogatory to the extent that it calls for production of information that is in the possession, custody, or control of the Defendant - with Defendant not yet having provided full Interrogatory and Document Responses, and with depositions of the Defendant and its employees still to be taken.

Subject to and without waiving these objections, Plaintiff provides as follows:  Plaintiff was not issued any reprimands at any employment in the last 40 years other than at Defendant McDonald's Corporation.

Plaintiff was issued two PIP's during her employment with Defendant McDonald's Corp. (one being a 60-day PIP in January, 2004 that was subsequently extended 60 days, and the other being on August 8, 2006), and Plaintiff was also terminated from her employment with Defendant McDonald's Corp.

See also Exhibit "A" annexed hereto.


**INTERROGATORY NO. 9:**    Identify each and every instance in which you were terminated, discharged, or laid off by any employer, stating for each such termination, discharge, and/or lay-off, the name of the employer and your supervisor:  the employer's stated reasons as to why you were discharged, terminated, and/or laid off;  how you learned about the reasons;  whether you agreed with and/or disagreed with the employer's reasons;  and, if you disagreed, whether you complained formally or informally.  If you complained about the termination, discharge, or lay-off, please describe that complaint process in detail, including details as to whom you complained, the form of your complaint (i.e., written, verbal, etc.), the content of your complaint, the status of your complaint, the final disposition of your complaint, and whether you were satisfied with such final disposition.

**RESPONSE:**    Plaintiff (who is age 59) was only terminated from two employments in the last 40+ years:  Plaintiff was terminated from her first job out of high school, where she was employed for 3 months, back in 1966;  and Plaintiff was terminated from her employment with Defendant McDonald's Corporation.

Plaintiff was terminated from her employment with Defendant McDonald's Corporation (by and through Janet Burton and Angelique Kelly-Lara). Plaintiff was terminated from Defendant in retaliation for Plaintiff's complaints of discrimination. Plaintiff filed an IDHR Charge and amended IDHR Charge regarding same, and ultimately filed the current federal lawsuit. Plaintiff also applied for, and was approved for, unemployment benefits.

**INTERROGATORY NO. 10:**    Describe completely and in detail all employment (including self-employment) held by you before, after, and during your employment with McDonald's including, but not limited to, providing the following information for each job held: the name and address of the employer; the dates of employment; the position(s) that you held at such employment; the job description for each position; the compensation that you received or are receiving in such employment (including your annual/monthly/weekly/hourly salary or wages, insurance benefits, pension benefits, vacation pay or benefits available, sick leave, authorized use of credit cards, overtime pay, holiday pay, income from any pension, profit-sharing or annuity plan, etc.); the name of your supervisor(s); and if, when, why, and how your employment ended.

**RESPONSE:**    See General Objections, including Nos. 1 and 2.

Subject to and without waiving these objections, Plaintiff provides as follows: see Exhibit "F" and Response to Interrogatory No. 11.

**INTERROGATORY NO. 11:**    Did you attempt to minimize your alleged damages? If your answer to this interrogatory is in the affirmative, for each such attempt, set forth: the details of your efforts, including the action(s) you took; the reasons for your action(s); whether such action(s) minimized your damages in any way; and, if so, in what way and by how much you minimized your damages.

**RESPONSE:**    See General Objections, including Nos. 1 - 2.

Subject to, and not waiving these objections, Plaintiff provides that after Defendant McDonald's Corp. (by and through Janet Burton and Angelique Kelly-Lara) terminated

Plaintiff's employment, Plaintiff searched for other employment.  Attached hereto at Exhibit "F"

is a copy of Plaintiff's job search records that were required by the State of Illinois Department

of Employment Security, which is accurate.

     After Defendant terminated Plaintiff's employment, and in addition to the aforesaid job

search:

- Plaintiff worked part-time at Macy's for approximately 2 weeks from in or about the end of October to November, 2006, at $8/hr.  Plaintiff earned $138.00

- Plaintiff worked part-time in the evenings and weekends at J.C. Penney's from November 15, 2006 to February 20, 2007, at $8/hr.  Plaintiff earned $1,889.11

- Plaintiff worked as a temp employee for Adecco from November, 2006 to November, 2007, at $14/hr. to $16/hr, earning a total of $30,940.84

- Plaintiff started a very small travel business, YTB Travel Network, from April 1, 2007 to present.  Earnings in 2007 were $105.00 gross

- Ultimately, on or about November 28, 2007 Plaintiff obtained her current employment, working as a Project Management Analyst, and earning an annual salary of $53,500.00 (note that although the $53,500.00 salary was $900.00 more the $52,600.00 salary that Plaintiff was earning at McDonald's Corp. in August, 2006 when Plaintiff's employment was terminated, unlike at McDonald's Corp. Plaintiff does not receive an annual bonus in her current employment, and Plaintiff would have received annual pay increases at McDonald's Corp. on or about March 1, 2007 and March 1, 2008)

See also Exhibit "E" annexed hereto and Plaintiff's complaints referenced within Plaintiff's

response to Interrogatory No. 1.


(note that Plaintiff's unemployment benefits, listed in response to Interrogatory No. 13 below,

are not listed here as mitigating Plaintiff's damages due to caselaw providing that such benefits

are not to be included in such calculations)


(note also that Plaintiff has not provided the name of Plaintiff's current employer because she is

very concerned that Defendant McDonald's Corp. directly, or through their attorneys or

investigators, will contact her employment (which she only recently started, in November 28,

2007) and inform her current employer of this litigation - which is not necessary towards

Defendant's defense of this litigation - and thereby or otherwise either intentionally or

unintentionally interfere with/ negatively impact her current employment)

**INTERROGATORY NO. 12:**    Describe completely and in particular each and every attempt
you made to obtain employment at any time after your employment with McDonald's ended,
including but not limited to providing the following:  the name and address of each prospective
employer;  the date of each contact regarding the prospect of employment:  the position that you
sought;  the salary that you sought;  whether you received an interview and, if so, with whom;
and whether employment was offered and, if so, state what your response was and describe the
terms and conditions of that employment including the compensation, insurance, and benefits,

**RESPONSE:**    See response to Interrogatory No. 11 above (as well as Exhibit "E" annexed

hereto).

Plaintiff's current employment (commenced November 28, 2007) is at an annual salary

of $53,500.00, with Plaintiff having 2-weeks vacation, a 401k, health insurance, life insurance,

disability coverage, but no annual bonus.

Plaintiff is currently salaried, so Plaintiff does not get overtime, in contrast to the

approximately $567 Plaintiff earned/ received in 2005 and approximately $829  earned/ received

in 2006 at her employment with McDonald's Corporation.

**INTERROGATORY NO. 13:**    Identify all compensation of any kind or character whatsoever
received from any source after your employment with McDonald's ended, including but not
limited to earnings, gifts, compensation, and benefits (including authorized use of credit cards,
unemployment compensation, welfare payments, vacation benefits, health insurance, overtime

pay, disability pay, sick leave pay, holiday pay, income from any pension, profit-sharing or annuity plan or any other income or benefit). In response hereto, provide detail about such compensation, including: the nature of the compensation (e.g., unemployment compensation, gifts, etc.); the full name and address of the provider of the compensation; the date(s) on which you received said compensation; the amount(s) of compensation so received; and the reason you received said compensation.

**RESPONSE:**    See response to Interrogatory Nos. 11 and 12 above.

Additionally, Plaintiff received IDES unemployment compensation benefits as follows:

$2,900.00 in 2006; and $1,468.00 in 2007.

Note, also, that although it is not compensation, Plaintiff had to take out the following

funds from her 401k towards meeting living expenses, to wit: $5,000.00 in 2006; and $1,505 in

2007.

**INTERROGATORY NO. 14:**    Identify each and every instance in which you have been accused, charged, and/or convicted of a crime, stating for each such accusation, charge, and/or conviction the following: the nature of the matter; where the matter occurred; the accusation and/or charge; the time of the matter; the name and address of your attorney at the time; and how it was resolved, whether by acquittal, dismissal, conviction, and/or other disposition.

**RESPONSE:**    None.

**INTERROGATORY NO. 15:**    Identify which of the individuals identified in Paragraph (A) of Plaintiff's Rule 26(a)(1) Initial Discovery Disclosures you have communicated with since your employment with McDonald's ended. For each individual identified, state the approximate date of such communication and the matters discussed during each such communication.

**RESPONSE:**    See General Objections, including Nos. 1 and 2. Plaintiff objects to this

Interrogatory to the extent that it is vague, overbroad, or otherwise unduly burdensome. Plaintiff

further objects to this Interrogatory to the extent that it seeks information not precisely

answerable in this format, or as phrased, and is therefore unreasonable and burdensome to

request through the use of such Interrogatory. In this regards, Defendant could have obtained

much of such information more accurately, and avoided much of the unnecessary burden on

Plaintiff, through deposition testimony or phrasing the Interrogatory in a different manner.

Subject to and without waiving these objections, Plaintiff provides as follows: to date

since the termination of Plaintiff's employment, Plaintiff has spoken with the following

individuals listed within Plaintiff's Rule 26(a)(1) Initial Discovery Disclosures: Alvin Collins;

Brenda Elliott; Angelique Kelly-Lara; Carol Simmons; Sheila Young. See also Response to

Interrogatory No. 1 above.

On August 8, 2006, following Plaintiff's employment being terminated, Plaintiff then left
the conference room and went back to Plaintiff's desk and started cleaning it out. Alvin Collins,
the security guard, was standing in the hall outside the Charity offices. When Plaintiff finished
putting Plaintiff's things on a cart that the Charity had, Plaintiff rolled it to the hallway. Alvin
Collins and Plaintiff started walking towards the elevator. He said he didn't know it was
Plaintiff when they called. Plaintiff could tell he felt bad about what was happening to Plaintiff.
Plaintiff started to tear up because Plaintiff had held Plaintiff's tears all the while Plaintiff was
packing up Plaintiff's desk. He told Plaintiff to be strong and don't let them see you upset, and it
helped. Plaintiff made it down the elevator and to Plaintiff's car without completely breaking
down. He helped Plaintiff put Plaintiff's things in the trunk and he rolled the cart back towards
the elevator. Plaintiff said thank you and good-bye. Plaintiff got into Plaintiff's car and had a
good cry.

Plaintiff spoke with Carol Simmons on August 9, 2006, the day after Plaintiff was
terminated from her employment. In that conversation Ms. Simmons advised that "they are
saying that you quit." Plaintiff told Ms. Simmons in that conversation that Plaintiff did not quit,
but that Plaintiff was fired.

The last time Plaintiff spoke with Ms. Kelly-Lara was on or about August 15, 2006,
which was after Plaintiff had been fired. Plaintiff had learned, the day after Plaintiff was fired,
that McDonald's Corp. was telling people in the Charity that Plaintiff had quit Plaintiff's job.
Plaintiff called HR to find out what was on Plaintiff's record, and was told that it listed that
Plaintiff had quit. Plaintiff was in a near panic when Plaintiff called Ms. Kelly Lara, asking her
why they were telling people Plaintiff had quit my job, when Plaintiff knew Plaintiff had not
quit. Plaintiff also asked how would Plaintiff get unemployment if, as Defendant was claiming
(falsely) Plaintiff had quit Plaintiff's job? In Plaintiff's mind homelessness loomed in front of
Plaintiff. Plaintiff felt helpless and desperate, and she something close to terror. It's hard
enough to survive on unemployment, let alone survive without a penny coming in. Ms. Kelly-
Lara barely said anything, but that she didn't have anything to do with what the unemployment
office would do, and that would be their decision. Plaintiff couldn't believe what she was

hearing. Plaintiff said to Ms. Kelly-Lara, "Angelique, you know you fired me." Ms. Kelly-Lara did not deny that she fired Plaintiff, nor did she say anything in response - just silence. Plaintiff then said good-bye and got off of the phone. All Plaintiff could do was pray that somehow the unemployment office would rule favorably for Plaintiff.

In or about August, 2007 Plaintiff had lunch with Brenda Elliott and Carol Simmons. During that lunch Plaintiff and Brenda Elliott and Carol Simmons did not discuss what happened during Plaintiff's employment or in the termination of Plaintiff's employment. This was the last time that Plaintiff spoke with Carol Simmons.

In or about November, 2007 Plaintiff had lunch with Ms. Elliott. Plaintiff and Ms. Elliott did not discuss what happened during Plaintiff's employment or in the termination of Plaintiff's employment. This was the last time that Plaintiff spoke with Ms. Elliott.

Plaintiff communicated with Sheila Young on various occasions, most recently in or about December, 2007. One thing Plaintiff recalls telling Ms. Young is that Plaintiff did not quit her McDonald's Corp. employment (which is what Defendant was claiming), but rather that Plaintiff was fired from Plaintiff's employment with McDonald's Corp. In Plaintiff's conversations with Ms. Young, Plaintiff and Ms. Young also generally discussed how they were doing and general things of that nature.

In August, 2007 Plaintiff had lunch with Brenda Elliott, and approximately 2 weeks later Plaintiff spoke with her on the phone. In these conversations Plaintiff and Ms. Elliott did not discuss Plaintiff's termination or lawsuit issues, but generally discussed how they were doing and general things of that nature.

See also Response to Interrogatory No. 1 above.

Plaintiff anticipates that she and her attorney will be making further contacts with individuals identified in Paragraph (A) of Plaintiff's Rule 26(a)(1) Initial Discovery Disclosures in connection with this litigation.

**INTERROGATORY NO. 16:**    State each and every basis for Plaintiff's assertion that she (i) "had good and excellent work performance"; and (ii) was "a hard worker who was well-liked by her co-workers as well as her supervisors" as alleged in Paragraph 10 of the Complaint.

**RESPONSE:**    See General Objections, including Nos. 1 - 3. In particular, Plaintiff objects to

this Interrogatory to the extent that it seeks information not precisely answerable in this format,

or as phrased, and are therefore unreasonable and burdensome to request through the use of such

Interrogatories. In this regards, Defendant could have obtained much of such information more

accurately, and avoided much of the unnecessary burden on Plaintiff, through deposition testimony or phrasing the Interrogatories in a different manner.  Plaintiff also objects to this Interrogatory to the extent that it calls for production of information that is in the possession, custody, or control of the Defendant -  with Defendant not yet having provided full Interrogatory and Document Responses, and with depositions of the Defendant and its employees still to be taken.

   Subject to and without waiving these objections, Plaintiff provides as follows:

   a.   in or about late January, 2006 Defendant had conducted a round-table evaluation, as a result of which Plaintiff received the highest raise and highest bonus amongst the 3 administrative staff in her department;

   b.   in or about January, 2006 Plaintiff was rated a "significant contributor";

   c.   in or about March, 2006 Plaintiff received a 5% raise and 100% of Plaintiff's target bonus;

   d.   on or about June 27, 2006  -  1-½ months before Plaintiff's employment was terminated  -  Defendant issued Plaintiff a favorable mid-year performance review;

   e.   Plaintiff was able to successfully perform her job under extremely difficult circumstances (and to the detriment of her health), and with a minimal of errors. While the other admins in the department worked for not over 3 people, Plaintiff worked for 6 people and then later 7 people.  The other admins had managers who were self-sufficient and pretty much did there own copying, faxing, etc., whereas Janet Burton was encouraging and pushing her managers to use Plaintiff to do their own copying, faxing, etc., as well as her offering Plaintiff to other staff outside of RMHC;

   f.   A vast majority of the errors that Defendant has listed in its EEOC position statement that defendant has claimed Plaintiff made were not Plaintiff's errors, and are provably (through Plaintiff's testimony, the testimony of others, and a review of documents) clearly not Plaintiff's errors but rather were false allegations by Defendant and were the errors of others;

   g.   Per the reference letter from the in-house manager from Manpower (Bates 1) Plaintiff was well-liked by the officers Plaintiff supported when Plaintiff was a temp;

h.    In or about the end of March, 2006 Ken Barun told Plaintiff that Plaintiff had done a great job for RMHC and that he would be glad to give Plaintiff a reference. In this regards, also, see Plaintiff's e-mail dated May 1, 2006 (Bates 18);

i.    Plaintiff has maintained good relationships with her co-workers even after the end of her employment (see response to Interrogatory No. 15); and

j.    Defendant has repeatedly claimed, falsely, in this litigation that it did not terminate Plaintiff's employment, with such claim by Defendant being a tacit admission by the Defendant that it did not have a sufficient or proper basis to terminate Plaintiff's employment.

See also Plaintiff's responses to Interrogatory Nos. 1 and 2 above.

See also additional documents showing Plaintiff's good work performance and being a hard worker, including but not limited to, Bates 1, 4, 6-11, 14-18, 20, 32-90, 104-115, 142-153, 156-157.

**INTERROGATORY NO. 17:**    Identify with specificity each and every instance (including specific dates) when Janet Burton (i) "treated Plaintiff with hostility and made Plaintiff feel ostracized by Plaintiff's team", as asserted in Paragraph 13a. of the Complaint; (ii) "gave Plaintiff extra work and work of the other administrative coordinators" and managers in an attempt to overwhelm Plaintiff, as asserted in Paragraph 13b. of the Complaint; (iii) "withheld Plaintiff's evaluation past the due date, with her negatively changing the verbiage", as asserted in Paragraph 13c. of the Complaint; (iv) "excluded Plaintiff from staff meetings", as asserted in Paragraph 13d. of the Complaint; and (v) "gave Plaintiff menial tasks to do, with plaintiff not being allowed to take the lead in Plaintiff's job, and with Plaintiff being treated like Plaintiff was not intelligent", as asserted in Paragraph 13e. of the Complaint.

**RESPONSE:**    See General Objections, including Nos. 1 - 3. In particular, Plaintiff objects to

this Interrogatory to the extent that it seeks information not precisely answerable in this format,

or as phrased, and are therefore unreasonable and burdensome to request through the use of such

Interrogatories. In this regards, Defendant could have obtained much of such information more

accurately, and avoided much of the unnecessary burden on Plaintiff, through deposition

testimony or phrasing the Interrogatories in a different manner. Plaintiff also objects to this

Interrogatory to the extent that it calls for production of information that is in the possession, custody, or control of the Defendant - with Defendant not yet having provided full Interrogatory and Document Responses, and with depositions of the Defendant and its employees still to be taken.

Subject to and without waiving these objections, Plaintiff provides as follows: There was and is much communication regarding, but not limited to, items i, ii, iii in particular (this is discussed in greater detail within Plaintiff's responses to Interrogatory Nos. 1, 2, and 16 above, and the documents referenced therein). Additionally, it should be noted that:

- Plaintiff was given Plaintiff's tip sheet in March, 2006 but it took until June, 2006 (and repeated efforts) for Plaintiff to receive a signed performance evaluation, with such evaluation having been noticeably skewed to reflect a negative view of Plaintiff's performance, despite Plaintiff having been told that Plaintiff had received the highest bonus and raise amongst the admins in the department.

- In March, 2006 Janet Burton had met with Plaintiff to go over the performance review that Ms. Burton had prepared of Plaintiff for 2005. Plaintiff and Ms. Burton discussed the review, in particular Ms. Burton's repeated references therein to Plaintiff's prior PIP. Ms. Burton was reading the review to Plaintiff but did not finish reading it to Plaintiff. In that conversation Ms. Burton said, on Plaintiff's request, that she would revise the performance review to take out the repeated references to Plaintiff having been on PIP and that they would meet again. Ms. Burton did not at that March, 2006 meeting let Plaintiff have a copy of the performance review, nor did she at that meeting let Plaintiff read the performance review herself. When Plaintiff finally received Plaintiff's performance review for 2005, on or about April 16, it had been much more negative than what had been previously read to Plaintiff by Ms. Burton in March 2006.

- As revealed upon a review of documents produced by Defendant in this litigation (Defendant Bates **110-118, for example**) team leaders were encouraged to think of more work to place on Plaintiff. None of the other admins in the department did travel mapping, itinerary preparation, or filing for the few people they worked for. It shows that the team leaders were coached in their responses because they basically had much of the same verbiage on their sheets.

- Plaintiff was excluded from the team meetings held on March 16, 2006 and May 9, 2006. Plaintiff wasn't even told about the meeting or asked to attend. Janet Burton usually told Plaintiff when Plaintiff was included.

- ○ Plaintiff has some samples of Plaintiff being given menial tasks to do (see Bates 107-108). Plaintiff was given copy jobs that had to be returned to the team leaders for distribution, as if Plaintiff wasn't capable of doing so; Plaintiff was given a merge letter to mail and told to confirm with the team leader when Plaintiff was ready to send it, as if Plaintiff couldn't be trusted to do this on her own; Plaintiff was given a business card to mail to a child collecting for the Guinness Book of Records; the staff wanted constant feedback that Plaintiff had done what they asked Plaintiff to do even though Plaintiff had been doing so for 2 years and had been keeping the staff reasonably informed of what Plaintiff was doing for them; Plaintiff was overly-frequently given directions on copying, which was treating Plaintiff like Plaintiff was not intelligent; It was said in Plaintiff's presence several times how smart Josephine Fazio was, by Marty Coyne and Laurel Schumm, but they did not say that about Plaintiff.

See also Plaintiff's responses to Interrogatory Nos. 1, 2, and 16 above, and the documents

referenced therein.

**INTERROGATORY NO. 18:**    State the basis for Plaintiff's belief/assertion that McDonald's hired a "non-black, less qualified, applicant" for the Administrative Coordinator position in Memphis, TN, as alleged in Paragraph 15 of the Complaint.

**RESPONSE:**    Plaintiff objects to this Interrogatory to the extent that it calls for production of

information that is in the possession, custody, or control of the Defendant  -  with Defendant not

yet having provided full Interrogatory and Document Responses, and with depositions of the

Defendant and its employees still to be taken.  Plaintiff also objects to this Interrogatory to the

extent that it seeks documents or information protected from disclosure by either the attorney-

client privilege or by the attorney work-product doctrine.

Subject to and without waiving these objections, Plaintiff provides as follows:

Plaintiff was encouraged to apply for this position by Buffy Bye (Regional Administrative Supervisor) even after Plaintiff initially declined. Plaintiff was told by Ms. Bye that Plaintiff was the internal candidate. Ms. Bye spoke with Plaintiff for over one hour and seemed very excited about the fact that Plaintiff had worked for senior level executives in the corporate office for 2 years. She encouraged Plaintiff to consider moving to Memphis, advising

21

that she had just moved there herself.  We ended the call with her asking Plaintiff who to contact for Plaintiff's references and Plaintiff telling her Angelique Kelly-Lara. (with Plaintiff's resume, Exhibit "U" to Defendant's position statement, at the last page, listing Ken Barun/ Janet Burton as Plaintiff's supervisor).

Plaintiff believed that Plaintiff was more qualified than the person selected because Plaintiff had believed that Plaintiff was the only internal candidate for the position.  Plaintiff believed that the person selected was non-black because from Plaintiff's observations those administrative positions where the admins worked for high-level officers generally went to white employees.

**INTERROGATORY NO. 19:**    State the basis for Plaintiff's belief/assertion that McDonald's promoted an individual into the Regional Administrative Manager position that was less-qualified than Plaintiff, as alleged in Paragraph 17 of the Complaint.

**RESPONSE:**    Plaintiff objects to this Interrogatory to the extent that it calls for production of

information that is in the possession, custody, or control of the Defendant  -  with Defendant not

yet having provided full Interrogatory and Document Responses, and with depositions of the

Defendant and its employees still to be taken.  Plaintiff also objects to this Interrogatory to the

extent that it seeks documents or information protected from disclosure by either the attorney-

client privilege or by the attorney work-product doctrine.

Subject to and without waiving these objections, Plaintiff provides as follows:

Plaintiff was encouraged by Ellen Wenger to apply for this position.  Plaintiff was told by Ms. Wenger that Plaintiff was the only qualified internal candidate, and that they would not be considering any other internal candidates.  Defendant had Plaintiff travel to North Carolina to be interviewed.  There was an e-mail that went out requesting information of anyone who might be interested in relocating, so Defendant wasn't adverse to someone moving to take the job. Moreover:

- The person who Defendant selected for this position (Ms. Chris Rhem), who is white, had been employed by McDonald's Corporation for only one year (which was less than Plaintiff), with Defendant having made it clear that Defendant gives preferences to internal candidates and doesn't usually hire from outside the

company for certain positions (such as administrative positions helping high-level officers), and with Dave Dresden having also advised Plaintiff in October, 2004 to stay in the department for at least one year, with him stating that it would be easier to transfer out after that time;

⊙    Defendant listed as a requirement for this position that the candidate "must possess" a Bachelor's degree in business administration (see Exhibit "X" to Defendant's IDHR Position Statement). Yet it appears that the person who Defendant selected for this position had no Bachelors Degree at all (see Exhibit "Y" to Defendant's IDHR Position Statement, in which Plaintiff's resume and application materials do not reveal that she had any degrees). By contrast Plaintiff had and has a Bachelor's degree in business administration (see Exhibit "T" to Defendant's IDHR Position Statement).

**INTERROGATORY NO. 20:**    Describe with specificity the statement Plaintiff alleges Marty Coyne made to Plaintiff during Plaintiff's conversation with Mr. Coyne on August 3, 2006 that led Plaintiff to conclude that Mr. Coyne was aware of the content of Plaintiff's conversation with Pat Harris on August 3. 2006, as asserted in Paragraph 20 of the Complaint.

**RESPONSE:**    See Exhibit "C" annexed hereto.

**INTERROGATORY NO. 21:**    Identify all "similarly situated individuals who had not complained of discrimination" referred to by Plaintiff in Paragraph 26 of the Complaint.

**RESPONSE:**    Plaintiff objects to this Interrogatory to the extent that it calls for production of information that is in the possession, custody, or control of the Defendant - with Defendant not yet having provided full Interrogatory and Document Responses, and with depositions of the Defendant and its employees still to be taken.

Subject to and without waiving these objections, Plaintiff provides as follows: this would include all individuals who worked at all under Janet Burton in the Field Relations Group (Donnell Bullock, Jackie Meara, Juana Sanchez, Ellen Early, and Phoebe Sebring), as well as also those employees and other employees (in other departments) with regards to whom

Angelique Kelly-Lara performed H.R. services involving either issuance of a PIP or issuance of a document in which the employee refused in a meeting to then sign the document presented to them.

Dated:  April 22, 2008

                                        Respectfully,

                                        By: _____
                                            David Porter

DAVID PORTER, ESQ.
Attorney for Plaintiff
11 S. LaSalle Street  -  Suite 1000
Chicago, Illinois 60603
(312) 236-1207

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on April 22, 2008 he caused a copy of the foregoing **Plaintiff's Response to Defendant's First Set of Interrogatories**, to be served on the office of:

> Nigel F. Telman, Esq.
> Sidley Austin LLP
> One South Dearborn
> Chicago, Illinois 60603

by personal delivery.

David Porter

EXHIBIT "A"

**Janet Burton –**

The first time I complained to her was in June 2004 when we met for my first midyear review. She told me I was doing a great job and then asked me if there was anything that I had concerns about. I told her that I needed to be able to prioritize the projects given to me or be able to work some overtime. She blew up saying that she told me when I was hired that there was a lot of work. I told her I was not complaining about the workload but about the inability to prioritize the workload. Every project had to be done at the same time. She mumbled something about "work harder and faster." Then she took it back saying I won't say that; of course, she already had. I felt after that first meeting that I couldn't bring concerns to her that she didn't want to hear. She also used this against me when I was put on the first PIP.

The next time I complained to her was during the Executive Training session in October, 2004. She attacked me in my cubicle in front of Vicki Laws (the clerk who sat next to me). I asked her if we could perhaps go to her cubicle (which was in the corner by the window) hoping this would get me some distance from others. She continued to berate me about the training session. I had worked so hard coordinating that training session in the midst of everything else. I was crushed. That was the first day that I cried. I couldn't remember crying on a job ever. I felt so humiliated and abused especially since she had let others hear.

The third time I complained to her was when she put me on the PIP for two months in January 2005. Marty Coyne was present. She read off her lies about me which she seemed to like to do because it was a knife in your heart to hear someone speak lies about you. It was like rubbing salt in the wound. When she finished, she and Marty told me that they wanted me to succeed. I signed the PIP with my comments stating that I was totally unaware of the fact that this was coming. It was a shock to me that I was being placed on a PIP. I also met with Dave Dresden after this and he told me there was nothing I could do but wait it out.

The fourth time I complained to her was 2 weeks before my PIP was to end. I was in the midst of coordinating the Executive training session which was happening in two weeks. She told the controller, Jean Zajac, that I could do a project for her. I did the project, in spite of what was on my plate, and then Jean Zajac came back with more to do on the project. She wanted it by next day. I told her I couldn't do that because of the training session I was working on. I went to Janet and told her that I needed to focus on the training session coming up and that Jean wanted this project next day. I could do the project, but I needed more time. She said, "Do the best you can" dismissively. I went a step further protesting, "But Janet I'm swamped." She snatched the project from me and said, "I'll do it myself." I said Janet you don't have to do it but she said, angrily, that's alright I'll do it. I knew I was in big trouble. Sure enough when my PIP ended 2 weeks later, she extended my PIP for two more months to teach me a lesson. She even mentions

1

the incident in her comments on the extension. She let me know that's why she was extending my PIP. After that, I felt that if I was going to survive I couldn't say anything, but just do what I was told. On May 25, she released me from the PIP. I looked forward to transferring out of the dept.

After I gave notice that I was looking for another position (which I was required to do), I felt Janet changed my evaluation, and I asked to meet with her several times to discuss this. When she met with me, she was very abrupt and refused to talk about the evaluation. She told me that, "Now is not the time." I thought to myself, when will it be the time? I told her I was looking for positions and would inform her of interviews. She said, sneeringly, "How is that going?" Like she knew she was going to keep anything from happening in that direction.

Then next time I complained to her was the meeting with Angelique to get my evaluation signed. That was when Angelique told me a performance evaluation wasn't supposed to be necessarily positive, and I said it should reflect the bonus and raise. Angelique did most of the talking. She told me that it would be better if I removed the statement I had typed on my evaluation about the belief that my evaluation was changed. Janet just sat there looking. The only thing Janet said was that she was not changing the things she said in the evaluation. So we just signed the document and left.

2

**EXHIBIT "B"**

August 3, 2006  (Pat Harris)

I called Pat Harris, Chief Diversity Officer, and requested a meeting with her. She told me to come on over. She was at the Campus Office Building that day where I worked. I met with Pat for approximately 40-45 minutes. During my meeting with Pat I specifically told her that I felt I was being discriminated against.

I told her I had applied for three positions that I should have gotten because of the prior interaction with the people that were recruiting for the position. I was told I was the only internal candidate for these positions. I told her about how I had reached out to these different divisions and had gotten responses from them. We settled our discussion on the position in Raleigh, NC because it was a managerial role. I told her about Ellen Wenger, the HR Director who had responded to my Raleigh inquiries. I had asked Ellen about another position that was posted a few months prior. Sometime later, I just happened to call Ellen and was told by her office that she was in Oak Brook that day for a training session. I called her on her cell phone and she told me she would meet me in the lobby. We chatted in the lobby and she told me about an administrative manager position that was opening in Raleigh and that she thought I would be a good candidate for it. She told me that there was no internal person that was being seriously considered for the position and to keep my eyes open for the posting. We walked back to the HR offices and she asked me to sit and chat with her briefly about my background. When the position was posted, I applied for it and was granted an interview in Raleigh. Pat asked me who I had interviewed with in Raleigh. I told her Marty Rantt, Kenneth Rickert and the outgoing administrative manager. She told me she knew Marty Rantt. Pat seemed anxious when she said, "I wish you had talked to me first. I would have called Marty." I said I didn't know that I needed to do that.

I told her Marty Rantt told me he knew Marty Coyne, and that he was going to contact him. I told her that I believed that I didn't get the position because of negative comments from Marty Coyne, which he had no business making since my status with McDonald's was satisfactory. She seemed to think so too because I had traveled all the way to North Carolina and she knew I wouldn't have even gotten an interview if they weren't interested in me. She responded, "Somebody said something."

I also told her about my belief that Janet Burton had changed my performance evaluation. I told her I hadn't received my written evaluation like I was supposed to, but that it was held on to and when I told Janet I wanted to advance to another department, I believed the evaluation was changed. I told her what I received as a bonus and my raise. I told her that Angelique told me, in a meeting I had with she and Janet, that a performance evaluation wasn't supposed to be positive per se, but constructive. Pat agreed that the evaluation should be commensurate to the raise and bonus a person received, and I told her mine was not.

I also told her about the position that became available in the Charity that I had discussed with Janet Burton, that of a field relations manager. I told her I was told by Janet that she was looking for someone who could "hit the ground running." She asked me what does that mean? I said I don't really know because if an external candidate gets the position, they will have a bigger learning curve than me. I at least knew the company. I told her that's when I decided to seek advancement elsewhere.

I told Pat about Josephine Fazio (a white admin in the department), who I thought was being prepped to advance, and I contrasted how she was being treated as compared to how I was being treated. I told her Josephine was being given all sorts of opportunities to head up projects and work with the Board of Directors for the Charity since she came to work for them. Early that year (2006) she had received her bachelor's degree and it seemed that things had accelerated in that direction. I told her that Josephine worked for 2.5 people and there was no attempt to add anyone else to her plate because they were allowing her the freedom to do other things besides support people. I also told her about the laptop that had been purchased for Josephine the first of the year, whereas all of us (the other admin) were given PCs. We weren't even told we had the opportunity to have a laptop (which is a symbol in corporate America of advancement).

Pat asked me if anyone knew I was talking to her. I told her No. She asked if I had met with Janet and Marty to talk about my concerns. I told her I had asked for a meeting that was scheduled for the next day in the morning. She told me she would be out of town but to leave her a voicemail to let her know how things went. She also told me that she was going to talk with Angelique Kelly-Lara before her next meeting that day. We walked toward HR and I left her in the hall right outside of the HR offices.

Later that day around 4:30 pm, as I was going to the mailroom which is outside of the main lobby of the building, I saw Pat Harris waiting in the lobby. I spoke to her and she seemed distant. She seemed to avoid me. I believed then and still believe it was because she had talked to people about me. She told me she was waiting for her granddaughter. She promptly went to the lobby phone and ended our conversation. She didn't say anything about our prior conversation.

**EXHIBIT "C"**

August 3, 2006 (Marty Coyne)

I believe that Pat Harris had spoken to Marty Coyne because:

a.      When I invited Marty to the meeting with Janet and Angelique and me, he didn't even respond, so I didn't think he would be involved.  But then all of a sudden, at approximately 4:00 p.m., Marty comes to my desk, on the same day after I spoke with Pat Harris and asks to speak to me in a conference room.

b.      He told me he knew that I had scheduled a meeting with Janet and Angelique for the next day, but that they were going to have to change the date to Tuesday, August 8 due to a Board Meeting.  Then he said what I thought was odd for him to say.  He said, empathically, that he had not spoken to Marty Rantt about me.  He seemed defensive and anxious.  I thought it odd because I hadn't mentioned Marty Rantt in this conversation.  In my email to them, I just said I wanted to discuss what was going on with my job opportunities.  Also, he had already told me that a week ago when he was passing by in the hallway.  I had asked him then had Marty Rantt called him.  He said very cavalier, "No he hasn't.  I haven't  talked with him."

c.      It should be noted that in my meeting with Pat Harris earlier that day (August 3rd) I had told her that Marty Rantt had told me that he knew Marty Coyne, and that he was going to contact him.  I told her that I believed that I didn't get the position because of negative comments from Marty Coyne, which he had no business making since my status with McDonald's was satisfactory.  She seemed to think so too because I had traveled all the way to North Carolina and she knew I wouldn't have even gotten an interview if they weren't interested in me.  She responded, "Somebody said something.".  So I knew Marty Coyne had talked to Pat Harris (or at least he was aware of my conversation with Pat Harris earlier that day, since he out of the blue again brought up Marty Rantt and he was very defensive and anxious when bringing this up.

**EXHIBIT "D"**

August 8, 2006

On August 8, 2006 Janet Burton came to my desk around 2:00 pm and requested that I meet early with the group. I responded sure, and we walked together to the conference room. Angelique Kelly-Lara was waiting in the room to meet with us, but Marty Coyne was not. When I sat down Janet stated to me that she knew I was expecting a different meeting, but they wanted to meet with me regarding my performance instead. The meeting lasted for approximately 35 minutes. Janet was visibly angry, and she was loud and taunting. She said they were not pleased with my performance, and I made a comment that I was trying to leave the department and work somewhere else…. and she interrupted with taunting remarks of "and what, and what." I fell silent and she said they had decided to put me on a performance improvement plan. I couldn't believe it. She gave me a copy of the PIP that she and Angelique had. As she read the pages to me, I could see that it was filled with lies again. I was also reading along, and had read the entire document. When she had almost finished reading the document, I told her I didn't want to hear any more. I asked her not to continue because what she saying was not true. I was so tired of being lied about. I turned to Angelique and said, you know these are all lies. Angelique said she didn't want to debate with me. I said that's fine because I couldn't debate either, but I was not going to sign that document. I felt like the air had been let out of me.

Janet said that if I didn't sign the document I would be terminated. I said I know, but I can't sign any more lies about me. She turned to Angelique to get the okay to proceed and Angelique said they would write on the performance evaluation that employee refused to sign, and then they both signed the document. Janet then turned to me and said, go clean out your desk.

I then left the conference room and went back to my desk and started cleaning it out. Alvin Collins, the security guard, was standing in the hall outside the Charity offices. When I finished putting my things on a cart that the Charity had, I rolled it to the hallway. Alvin and I started walking towards the elevator. He said he didn't know it was me when they called. I could tell he felt bad about what was happening to me. I started to tear up because I had held my tears all the while I was packing up my desk. He told me to be strong and don't let them see you upset, and it helped. I made it down the elevator and to my car without completely breaking down. He helped me put my things in the trunk and he rolled the cart back towards the elevator. I said thank you and good-bye. I got into my car and had a good cry.

**EXHIBIT "E"**

**Damage Calculations**

Plaintiff objects to this Interrogatory on the ground that some of the information necessary to respond to this Interrogatory is within the control of Defendant, with Depositions still to be taken, and with Defendant still to provide some additional documents and information. In particular, this includes the extent and monetary value of benefits received (and that should have been received) by Plaintiff from Defendant.  Moreover, Plaintiff has not yet obtained an expert(s) with regards to more accurately calculating her damages.  As such, Plaintiff's numerical calculations are based on approximate numbers and on approximate calculations at this time.  Plaintiff also objects to the extent that this interrogatory seeks documents or information protected from disclosure by either the attorney-client privilege or by the attorney work-product doctrine.

Moreover, Plaintiff's damage numbers provided below are made with the assumption that the trial of this action goes forward on or about January 1, 2009, and assuming that her income situation continues as she currently expects (which may, or may not, be an accurate assumption). If any of these items/assumptions change, Plaintiff's computations necessarily change. Additionally, reasonable attorney fees (which are awarded by the Court) are continually escalating due to the ever-increasing amount of work being performed in this case by Plaintiff's attorney, and at this time their ultimate number cannot reasonably be calculated, and have not been calculated.

Plaintiff's damage calculations, subject to the above, are provided on the following

pages:

A.    **<u>Calculation of Damages</u>**    (all numbers are approximations)

1.    <u>Backpay</u>                                                              $ 58,641.93+
        Salary and annual bonuses

      (to be calculated based on the difference between what Plaintiff
      would have earned if her employment had not been terminated
      by Defendant and what Plaintiff has actually earned up to the
      time of trial)
            -    calculated through to January 1, 2009
            -    discussed in greater detail below
               in section B

2.    <u>Frontpay</u>                                                            $ 53,970.00+

      (to be calculated based on the difference between what Plaintiff
      would have earned annually if her employment had not been
      terminated by Defendant, minus what Plaintiff has actually
      earned going forward 5 years beyond the date of the trial)

            -    to be calculated from January 1, 2009
               (anticipated trial date) forward five (5)
               years
            -    calculated based on what Plaintiff would have
               been expected to earn annually working for
               McDonald's Corp. (salary and annual bonus
               and 401k matching) in 2009, minus her actual
               current annual net income, with this number
               thereby being multiplied by five

             $66,969.00 - $56,175.00 = $ 10,794.00

             $10,794.00  x  5 years

3.    <u>Back-Benefits</u>                                                      $  4,442.65+

      401k (see section B), and the expenses of health (medical
      and dental) insurance and medical expenses

4.    <u>Emotional Distress and Compensatory Damages</u>          $ 100,000.00+

      -      discussed in greater detail below
             in section C


5.    <u>Punitives</u>
                -    discussed in greater detail below
                     in section C                              =    $ 100,000.00+


6.    Costs & Disbursements
                -    continually increasing                    =    not yet calculated


7.    Pre-judgment Interest
                -    continually increasing                    =    not yet calculated


8.    Reasonable Attorney Fees
                -    to be determined and awarded
                     by the Court, and continually
                     increasing                                =    not yet calculated

B.     **Back-Pay and Lost-Benefits Calculations**
         (numbers are approximations)

**Back-Pay**        **(through 1/1/09)**

What income Plaintiff expects she would
have earned (approx.) at McDonald's Corp.
from August 9, 2006 to Jan. 1, 2009                           $ 150,061.67

-      Based on her 2006 salary of $52,600.00,
       anticipated 5% salary increases of per year
       and annual bonuses of $5,000.00 per year                      .

              5 mos. salary in 2006    =    $21,916.67
              12 mos. salary in 2007   =    $55,230.00
              12 mos. salary in 2008   =    $57,915.00
              3 yrs. of bonuses        =    $15,000.00

What income Plaintiff expects to have earned/
received (approx.) from August 9, 2006 to Jan.
1, 2009 (with unemployment benefits not being
included in these calculations due to caselaw
providing that such benefits are not to be
included)                                                    $   91,419.74

              Aug. 9, 2006 to Dec. 31, 2006  =  $  3,021.49
              12 mos. income in 2007         =  $34,898.25
              12 mos. income in 2008         =  $53,500.00

       $150.061.67 - $91,419.74   =                              $ 58,641.93

**Lost-Benefits**        **(Aug. 9, 2006 to Jan. 1, 2009)**              $  4,442.65+

       Monthly 401k

-      At McDonald's Corp Plaintiff was able to, and did,
       put up to 7% of her monthly income into a 401k, and
       Defendant matched that 7%          ($7,920.15 matching)

-   At Plaintiff's current employment, which began at
    the end of November, 2007 Plaintiff is able to put up
    to 5% of her monthly income into a 401k, and Plaintiff's
    current employer matches that 5%    ($2,922.59 matching)


**Total Back-Pay and Lost-Benefits
as of Jan. 1, 2009 (approx.)**                                   $  63,084.58+


## C.     Basis of Compensables and Punitives


As a result of the well-documented retaliation that resulted in Defendant (by and through Janet Burton and Angelique Kelly-Lara) issuing me the PIP and terminating my employment on August 8, 2006, I suffered not only the loss of my job (and an income and financial security) but also humiliation, great distress, extreme pain and suffering.  This greatly disrupted my home life as well as my work life.

I had worked very hard for the Charity, and after they fired me I was devastated.  It seemed like I had done it all for nothing.  It's hard to describe the anguish I felt.  If it had not been for my faith in God, I think I would have lost my sanity.  I felt like I was sinking down into a pit.  I'm the type of person who takes pride in her work.  I work hard because it's important to me to do a good job. I instilled the same values in my 4 children.  Each of them are diligent workers and trustworthy on their jobs.  We are very close because it has been just the 4 of us since their father died over ten years ago.  I raised my children while I was going to school nights and weekends to get the degree that I was told one needed to advance in one's career.  I thought about what message my firing would send to my children.

One of my sons was preparing to go back to his university in a couple weeks after my job was taken.  He had just one more year to complete for graduation.  Where was I going to get the money to help him?  Would he have to stop going to school until I found another job?  All of these thoughts ran through my mind during those weeks of anguish.

I was not only faced with looking for another job in a slow job market, but the day after I was fired, I learned that it was being said by people in the Charity that I had quit my job.  I called HR to find out what was on my record and was told that it was listed that I had quit.  I was in a near panic when I called Angelique Kelly-Lara asking her why they were telling people I had quit my job.  How would I get unemployment if they were claiming (falsely) that I had quit my job?  In my mind homelessness loomed in front of me.  I felt helpless and desperate, and something close to terror.  It's hard enough to survive on unemployment, let alone survive without a penny coming in.  Angelique Kelly-Lara barely said anything, but that she didn't have anything to do with what the unemployment office would do, and that it would be their decision.  I couldn't believe what I was hearing.  I said to Ms. Kelly-Lara, "Angelique, you know you fired me."  Ms. Kelly-Lara did not deny that she fired me, nor did she say anything in response -  just silence.  I

then said good-bye and got off of the phone.  All I could do was pray that somehow the unemployment office would rule favorably for me.

The above has served to greatly diminish the quality of my life.

I used to have great pride and satisfaction in my work, work performance, and work record with Defendant McDonald's Corp.  By Defendant's aforesaid retaliation against me, Defendant drove a stake through my heart and made sure that such pride and satisfaction were beaten down.


Punitive Damages

With respect to punitive damages, given the extensive evidence that the Defendant brazenly and viciously subjected Plaintiff Carol Rodgers to outrageous retaliation, with a clear intent to harm Plaintiff personally, financially, psychologically, and in her employment and profession, we feel that a substantial computation for punitive damages is appropriate, and that we can well meet the standard for punitive damages:

- that the acts of discrimination, harassment, or retaliation were practiced with malice or reckless indifference to the federally protected rights of an aggrieved individual.

## Carol D. Rodgers

1728 Brookdale Road, Naperville, Illinois  60563 o Home: (630) 527-0064 o Email: carol.rodgers@sbcglobal.net

**Objective:**  Seeking a challenging position that offers opportunities for growth and advancement.

### Summary

- ➢ Successful supervisory and project management experience
- ➢ Progressive responsibility in training and education
- ➢ Enthusiastic self-starter, energetic, take charge person

### Work History

**Adecco Temporary Service, Naperville, IL**
February 2007 – February 2008
Executive Assistant to President, Design & Construction
Oak Brook, IL

**November 2006 – February 2007**
**Assistant to the Property Manager**
**Cushman & Wakefield Property Managers, Aurora, IL**

**J.C. Penney, Aurora, IL**
November 2006 – February 2007
Retail Associate – part-time

**Macy's, Aurora, IL**
November 2006 (2 weeks)
Retail Associate – part-time

**Marshall Field's**
November 2002 – 2004
Retail Associate – part-time

**March 2004 – August 2006**
**Administrative Coordinator**
**McDonald's Corporation, Oak Brook, IL**
- ❑ Supported five very busy managers (including the president) on the field relations team for Ronald McDonald Houses including travel arrangements, meeting planning.
- ❑ Maintained Access database which includes updates and distributions to the field.
- ❑ Managed internal website – RMHC.net.
- ❑ Contact for field-related requests internally and from the field
- ❑ Event planning for several major meetings during the year – International Conference, Regional Conferences, Awards of Excellence, and World Children's Day.

**January 2002 – March 2004**
**Executive Assistant**
**McDonald's Corporation, Oak Brook, IL** (Manpower Temporary Agency)
- ❑ Assisted executive/senior vice presidents in marketing, human resources, and concept development with calendar maintenance, travel arrangements, meeting coordination, and project management for special events; using excellent communication skills performing multiple tasks in various departments.

Exhibit "F"

**July 1995 – January 2002**
**Training Coordinator**
**ServiceMaster Company, Downers Grove, IL**

- ❑ Coordinated and facilitated manager technical and soft skills training sessions
- ❑ Managed and organized the training registration process:
  - Completed needs analysis and researched potential contents for orientation packets
  - Wrote and presented proposal to respond to tracking training needs
  - Created and organized process for training registration
  - Created database to track training achieving 95% accuracy of records
- ❑ Conducted successful two-week orientation sessions for 30-40 new managers monthly
- ❑ Responsible for providing customer service to directors and managers
- ❑ Designed and coordinated training sessions such as change management and lifelong learning
- ❑ Conducted successful presentations to senior management and facilitators
- ❑ Assisted with coordination and booth preparation at the national convention
- ❑ Arranged facilitator special events (e.g. faculty appreciation and luncheons)

**May 1994 – July 1995**
**Administrative Supervisor**
**ServiceMaster Company, Downers Grove, IL**

- ❑ Managed staff of seven in administrative pool
- ❑ Served as interim manager for three months
- ❑ Hired, assessed, and assisted with training
- ❑ Tracked employee time
- ❑ Prepared and coordinated employee review process
- ❑ Consulted with employees regarding benefits and policies
- ❑ Maintained employee relations and ensured open communication with staff
- ❑ Worked with temporary agencies to meet staffing needs of directors
- ❑ Created resource manual as marketing tool for administrative pool

**December 1991 – April 1994**
**Executive Assistant to the Dean**
**West Surburan Hospital College of Nursing**

- ❑ Supervised administrative staff of four
- ❑ Hired, assessed, and trained staff
- ❑ Organized events for student/alumni activities
- ❑ Assisted dean in day-to-day operations
- ❑ Coordinated schedule and distributed minutes/materials for Board of Directors' meetings

**May 1985 – August 1992**
**Entrepreneur**
**Rodgers Secretarial Service, Oak Park, IL**

- ❑ Homebased business specializing in word processing, tape transcription, file organization, bookkeeping
- ❑ Participated in community small business seminars, which included booth preparation and distribution of marketing tools
- ❑ Contracted services as a temporary to corporations through referrals.

**February 1989 – June 1991**
**Adjunct Faculty**
**Triton College, River Grove, IL**

- ❑ Trained adult learners in keyboarding and basic office skills
- ❑ Achieved excellent facilitator evaluations
- ❑ Taught classes in math, spelling, and writing for adult learners

## Education & Training

### Lewis University, Romeoville, Illinois
Bachelor of Arts Degree in Business Administration
January 14, 2001

### College of DuPage, Glen Ellyn, Illinois
Associate of Arts Degree
May 1998

### Langevin Learning Systems
Certified Instructional Designer/Developer
November 2000